[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 03, 2002
THOMAS K. KAHN
CLERK

No. 01-12321

_____

D. C. Docket No. 98-01204-CV-T-24

SOUTHLAND DISTRIBUTORS MARKETING CO., INC.,
a Florida corporation, d.b.a. Southland Marketing,
BERNARD KANNER, a.k.a. Barry Kanner,

Plaintiffs-Appellants,

versus

S&P COMPANY, a foreign corporation,
PABST BREWING CO., a Delaware corporation,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(July 3, 2002)**

Before WILSON, RONEY and FAY, Circuit Judges.

PER CURIAM:

Plaintiff-appellant Southland Distributors Marketing Co., Inc. d.b.a. Southland Marketing, a Florida corporation ("Southland"), sued defendant-appellees S&P Company and Pabst Brewing Co., a Delaware corporation ("Pabst"), for $3,000,000 in liquidated damages, alleging that Pabst breached their agreement to make Southland its exclusive master wholesaler in six states when Pabst terminated the contract in May 1998. A magistrate judge, following a bench trial, conducted with the consent of the parties pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, entered judgment against Southland, finding that Southland had previously breached its contract with Pabst by selling and marketing products not produced by Pabst, a complete defense to Southland's breach of contract claim. We vacate and remand.

Magistrate Judge Elizabeth A. Jenkins, after a full bench trial, entered detailed "Findings of Fact and Conclusions of Law" which need not be totally repeated here. Generally, the evidence showed that in February 1991, Southland and Pabst entered into an oral agreement where Southland would serve as Pabst's "exclusive master wholesaler" for North Carolina, South Carolina, Tennessee, Alabama, Georgia, and Florida. The duration of the agreement was five years, with options to renew for at least two additional and consecutive five-year terms. Subsequently, Southland and Pabst exercised the first of the five-year options extending the contract to February 2001. As an exclusive master wholesaler, Southland acted as Pabst's representative

2

or salesperson for the southeastern region of the United States and received a commission for its sales of Pabst products to retailers.

In 1997 Southland wrote a letter to Pabst memorializing their 1991 oral agreement. The letter is backdated to the date of their 1991 oral agreement. The relevant portion reads as follows:

> Specifically, in exchange for my [Southland's] full time commitment to the sales and marketing of Pabst/S&P Company brands, you [Pabst] have agreed to make Southland Marketing an "Exclusive Master Distributor" and/or Exclusive Sales and Marketing Representative of Pabst/S&P Company brands in the southeast region of the United States (specifically North & South Carolina, Georgia, Florida, Alabama and Tennessee). This exclusive agreement shall have a duration of five (5) years with options to renew for at least two (2) additional consecutive five-year terms and provide Southland marketing with a commission of at least 10 cents per case, based on 24/12 oz. equivalents, consistent with our arrangement since 1986, for any brand of S&P Company brands . . . [t]his exclusive arrangement shall be binding upon the successors and assigns of the S&P Company, Pabst Brewing Company, or any other subsidiary of S&P Company.

On May 13, 1998, Pabst informed Southland that effective June 1, 1998, Pabst would terminate the agreement with Southland in five of the six states in the Southeast region, leaving Southland serving only Florida.

When Southland and its president, Barry Kanner, sued Pabst individually for breach of contract because of that termination, seeking the agreed-upon liquidated damages, Pabst asserted numerous grounds of defense:

(1) Barry Kanner was not a party to the alleged agreement and had no standing to enforce it. The district court upheld this argument. Because Kanner is not a party to this appeal, the holding is unchallenged here.

(2) Lutz Issleib, Pabst's president/chairman/CEO, was not authorized to enter into any agreements with the plaintiffs on behalf of S&P or Pabst. The district court held that Issleib was authorized to enter into the contract and there is no appeal from that decision.

(3) The agreement lacked consideration and was so vague as to be unenforceable. The district court held that the contract was not vague and had ample consideration. There is no appeal from that decision.

(4) The agreement was procured by fraud and is a "sham agreement." The district court held that the agreement is valid and there is no appeal from that decision.

(5) The liquidated damages provision is unenforceable. The district court did not reach this issue because it found that Southland breached its contract with Pabst.

(6) The agreement was oral, not written, and thus invalid. The district court's decision effectively held against this argument and there is no appeal on this issue.

4

(7) Southland was at fault for rejecting Pabst's new strategy. The district court ruled that Southland did not breach the agreement when it rejected Pabst's new strategy and there is no appeal from that decision.

(8) Pabst had the right to terminate the contract because from 1994 to 1997 Southland itself breached the contract by selling the following non-Pabst products: Brewski, Dunks, and Saranac, all premium priced beers, and Power Rangers, a children's soft-drink.

This last allegation presents the key question before the district court: was Southland's self-admitted selling of these non-Pabst products a breach of its agreement with Pabst for the "full time commitment to the sales and marketing of Pabst/S&P Company brands?" The district court held that that activity was a breach of the agreement by Southland and a reason for the defendants to terminate the contract. This appeal focuses on the correctness of that decision.

A district court's interpretation of an original contract is a question of law which we review *de novo. Gymco Const. Co., Inc. v. Architectural Glass & Windows, Inc.,* 884 F.2d 1362, 1364 (11th Cir. 1989) (citing *Brewer v. Muscle Shoals Bd. of Educ.,* 790 F.2d 1515, 1519 (11th Cir. 1986)). We will not disturb a trial court's findings of fact unless they are clearly erroneous. *Media Servs. Group, Inc. v. Bay*

5

*Cities Communications, Inc.,* 237 F.3d 1326, 1329 (11th Cir. 2001) (citing *Godfrey v. BellSouth Telecomms., Inc.,* 89 F.3d 755 (11th Cir. 1996)).

There is no question on this appeal regarding the validity or existence of the contract. Rather, the issue revolves around whether Southland's sales of non-Pabst products fell outside Southland's promised "full time commitment to the sales and marketing of Pabst/S&P Company brands."

Southland freely admits that it sold non-Pabst products, but argues that by selling the non-Pabst products, which did not directly compete with Pabst products, it was engaged in a type of marketing that would help increase sales of Pabst brands. Therefore, Southland argues, selling the non-Pabst products was part of its "full time commitment" to "market" Pabst products.

The district court addressed the argument that Southland breached the agreement by selling non-Pabst brands only in terms of the time involved, not in terms of whether the activity was within the meaning of the term marketing.

> Southland argues that the income it received from the non-Pabst/S&P products shows that its involvement with these products was minor. It is true that income from these products represented approximately one third of one percent of Southland's total income. Southland further contends that these products did not compete with any Pabst or S&P products . . . [and therefore] Southland argues that any breach was not "material" so as to discharge defendants' liability under the agreement. However, the issues is not whether these products directly competed with

6

those of Pabst or S&P, or whether Southland derived significant income from these products . . . Southland nevertheless devoted more than *de minimus* time and attention to marketing non-Pabst and S&P products. Southland therefore breached its obligation to devote its full time commitment . . . to the marketing of Pabst and S&P products.

Because these sales occurred for less than four years, had been abandoned well before the defendants sought to terminate the contract, and the income derived from the sales was only approximately one-third of one percent of Southland's total income, there may be some merit to the argument that this activity was not a defense to the breach of contract claim because it was *de minimus*; we accept the district court's decision in that regard.

The district court did not directly address, either in its opinion or in its order denying Plaintiffs' Motion to Alter or Amend Judgment, the core argument: that Southland's selling of these other non-Pabst products was done for the purpose of creating good will that would advance the sales and marketing of its Pabst products, which fits within the definition of full time commitment to the marketing of Pabst products. The record supports Southland's argument in this regard.

While Pabst claims in its brief that this notion is "nonsense," it conceded at oral argument that Southland's "push/pull" marketing theory is valid, where the "push" refers to manufacturers or exclusive master distributors encouraging their wholesalers

7

and/or retailers, through discounts, rebates, or other incentives, to "push" a particular product to consumers. Pabst also conceded at oral argument that distributors will often combine different beers or other products of different prices and qualities onto a single pallette for a "package deal," which helps move certain products that may be unrelated.

There is no evidence in the record to show that this was not in fact the purpose of Southland's selling the other non-Pabst products. Southland's expert witness testified that

> [i]f you don't have the money for marketing, you have to push the product through the market. And you push the product through the market by creating deals that make it attractive to the wholesaler to buy the product, wholesaler to sell the product to the retailer, or you provide some incentive to wholesalers to really go out and sell the product.

The district court itself found as a fact that Southland's purpose behind selling the non-Pabst products was to create goodwill that would better market and thus sell Pabst products. The record would not support a finding that this activity did not fall within the meaning of the "sales and marketing of Pabst products."

The record indicates that Pabst terminated its relationship with Southland not because Southland sold non-Pabst products, but because Southland's volume declines were unacceptable, and Southland's geographical region was a "disaster in terms of

volume" and Pabst wanted to "send the same signal [that] since the change in [Pabst's] management . . . non-performers would lose territory." In fact, the record shows that Pabst did not even know about Southland's non-Pabst sales nor the actual contract itself, with the liquidated damage clause, until after Pabst terminated its contract with Southland. All of the reasons asserted in defense of the breach of contract action appear to have been developed after Southland was terminated.

The plain meaning of the contract is clear – it specifically provides for Southland's full time commitment to the sales *and marketing* of Pabst/S&P Company brands. Southland promised to devote its full time commitment to *both* the sales and marketing of Pabst products, but *how* it chose to do so was at Southland's discretion. The contract does not provide for the full time commitment to the exclusive "sale" of Pabst products. The argument that the contract simply prohibits the sale of non-Pabst products is contradicted in the record by the testimony that the major actor for Pabst vis-a-vis the contract, Lutz Issleib, instructed Kanner to sell one of the non-Pabst products, Dunks beer.

The contract does not spell out the activities that could or could not be described as marketing. There seems to be no restriction on any activities engaged in for the purpose of marketing Pabst products. Thus, it is not the time Southland devoted to the non-Pabst products that controls, but the purpose of that activity to

9

increase the sales of Pabst products. The district court erred in holding that this activity was a defense against Southland's breach of contract claims.

The district court, of course, did not reach the claim that the liquidated damages provision was otherwise enforceable. Upon remand for calculation of the damages award to Southland, the district court will need to address this issue.

Southland alleged the district court erred in making, on Pabst's motion, two additional findings of fact. Although there was no procedural error, the district court's finding that Issleib would have objected to Southland's selling a line or a book of products other than Pabst products conflicts with the uncontradicted testimony that Issleib asked Southland to market Dunks beer. In any event, neither that finding nor the finding that Pabst executives never knew of or acquiesced in Southland's marketing of non-Pabst products affect our decision here.

REVERSED and REMANDED.